**[J-32-2018] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| C.G., | : | No. 2 MAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of the Superior |
| | : | Court at No. 1733 MDA 2016 dated |
| | : | October 11, 2017 Affirming the Order |
| v. | : | of the Centre County Court of |
| | : | Common Pleas, Civil Division, at No. |
| | : | 2015-4710 dated September 22, |
| J. H., | : | 2016. |
| | : | |
| Appellee | : | ARGUED:  May 15, 2018 |

## CONCURRING OPINION

**JUSTICE WECHT**                                                      **DECIDED:  September 21, 2018**

Governed by our well-settled standard of review, I join in today's result.  Along the way to this conclusion, my analytical journey diverges twice from the path that the learned Majority takes.  First, for purposes of adjudicating standing to sue as a parent in cases involving assisted reproductive technologies ("ART"),[1] courts must probe the intent of the parties.  Reliance solely upon biology, adoption and contracts is insufficient.  Second, for purposes of deciding *in loco parentis* standing, courts should consider post-separation conduct only when they first are able to determine that the custodial parent has not

---

[1]      For purposes of the discussion at hand, I include within the ART rubric the full variety of medical interventions designed to allow for reproduction through means other than sexual intercourse, including *in vitro* fertilization, sperm and egg donation, gestational surrogacy, and artificial insemination.  *See generally*, Jillian Casey, Courtney Lee, & Sartaz Singh, *Assisted Reproductive Technologies*, 17 GEO. J. GENDER & LAW 83, 83-85 (2016).

withheld the child from the other party. Otherwise, custodial parents effectively can preclude most *in loco parentis* claims by non-custodial parties. My thinking on these two points follows.

### Parentage and Intent

In affirming the Superior Court, the Majority correctly notes that the appellate panel's cramped definition of parentage as including only biological and adoptive parents overlooked the recognition of parentage by contract expounded in *Ferguson v. McKiernan*, 940 A.2d 1236 (Pa. 2007) and *In re Baby S.*, 128 A.3d 296 (Pa. Super. 2015).[2] This is fine as far as it goes. But it does not go far enough. The Majority draws too narrowly upon *Ferguson* and *Baby S.*, validating solely their contractual jurisprudence but declining to proceed further.[3] While a measured approach to standing is always appropriate,[4] the Majority's analysis , while reasonable in the main, nonetheless fails to

---

[2]  *See* Maj. Op. at 21. To this list, I would add that one can be found to be a parent, regardless of biology or adoption, through the presumption of paternity, *see Brinkley v. King*, 701 A.2d 176, 178-79 (Pa. 1997) (stating that a child conceived or born during a marriage is presumed to be the husband's child), and paternity by estoppel. *See Freedman v. McCandless*, 654 A.2d 529, 532-33 (Pa. 1995) ("Estoppel in paternity actions is merely the legal determination that because of a person's conduct (*e.g.*, holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage.").

[3]  *See* Maj. Op. at 21 & n.11.

[4]  At the time that C.G. filed for custody, the applicable statute provided standing to pursue custody to a parent, a person who stands *in loco parentis*, or a grandparent in certain specified circumstances. 23 Pa.C.S. § 5324 (2011). In response to J.H.'s preliminary objections, C.G. asserted standing as a parent or, alternatively, as someone who stood *in loco parentis* to Child. As the Majority notes, standing in custody cases is governed by statute. *See T.B. v. L.R.M.*, 786 A.2d 913, 916 (Pa. 2001) (stating that standing exists in custody cases when authorized by statute). Standing for custody purposes implicates the fundamental liberty issue of a parent's ability to direct the care and custody of his or her child. *See generally Troxel v. Granville*, 530 U.S. 57, 66 (2000).

imagine and embrace the intent-based paradigm that ART-related child custody disputes require.

Consider *Ferguson*. There, the trial court found, and this Court accepted, that the mother approached her former intimate partner with a request for sperm donation so that she could conceive a child via *in vitro* fertilization. *Ferguson*, 940 A.2d at 1239. Only after the mother convinced the sperm donor that he would bear no legal or financial responsibility for the prospective child did the donor agree to the arrangement. *Id.* The donor did not pay for the *in vitro* fertilization, did not complete most of the paperwork, and did not attend prenatal appointments. *Id.* at 1240. After mother went into premature labor, she requested the sperm donor to join her at the hospital, where she delivered twins. Afterward, with the mother's agreement, the sperm donor maintained anonymity, assumed no financial responsibility, and was not listed on the birth certificates. *Id.* Indeed, the donor had little contact with the mother or twins following the birth, provided no financial support, and assumed no paternal duties. *Id.* Rejecting the mother's public policy arguments, this Court decided that the oral contract between the mother and the sperm donor was enforceable and held that the mother was foreclosed from seeking child support from the donor. *Id.* at 1247-48.

Viewing *Ferguson* from the perspective of the parties' intent, the same adjudication would result. The sperm donor's actions bore all the hallmarks of a clinical donation of gametes calculated and designed to result in no parental role for the donor. The mother acted in accordance with that intention for approximately the first five years following the twins' births. She did not seek financial support, and she did not attempt to involve the sperm donor in the lives of her children. Neither the mother nor the sperm donor ever

manifested any intent for the latter to be a parent to the twins at any time before or after the birth; in fact, both the mother and the donor expressed and acted upon the opposite intention. And then, some five years on, the mother sued the sperm donor for child support. It was this volte-face that our Court declined to approve. By intention, as well as by contract, the mother's case for support was a non-starter.

Now, consider *Baby S..* There, in determining that the ex-wife was the legal parent of the child born through ART, the Superior Court focused upon the existence of a contract. But the appellate panel just as easily could have ruled based upon the parties' intent. The father and ex-wife signed a contract to enter into a surrogacy with a gestational carrier and evidenced their intent to be the legal parents of the resulting child. *Baby S.*, 128 A.3d at 298. The ex-wife's communications with the gestational carrier demonstrated the ex-wife's intent to be a parent to the child. *Id.* at 299. The father and the ex-wife chose a gestational carrier in Pennsylvania because the ex-wife could be listed on the birth certificate without having to go through the adoption process. *Id.* at 298. When the pregnancy was confirmed, the ex-wife and the father moved to a new home in order to accommodate a larger family. They attended the twentieth-week ultrasound and acted in a way that suggested that they intended to parent the child. *Id.* at 300. Only when the father and ex-wife began to experience marital difficulties did the ex-wife begin to act in a manner contrary to that joint intention. *Id.* at 301. Because the ex-wife gave every indication that she was the parent of the child conceived through ART, the Superior Court could have relied upon her expressed and manifest intentions in order to find that she was the child's legal parent. That the Superior Court relied instead upon the existence of a contract is no contradiction of this principle.

Viewed through the lens of the parties' intentions, the *Ferguson* and *Baby S.* cases arrive at the same destination reached *via* a contract-based analysis. This is unsurprising, inasmuch as the contract evidences the intent. But the point of this exercise is that ART requires us to hypothesize other scenarios, cases in which an intent analysis would not foreclose a valid claim to parentage while a contract-based approach would. Under the Majority's formulation of parentage by contract, one becomes a parent through use of ART and the formation of a binding contract regarding ART. Maj. Op. at 21. Fair enough. But suppose that the members of a same-sex couple decide that one partner will become pregnant *via* ART and sperm donation; it is entirely foreseeable that only the partner being impregnated would contract with the ART facility. The second partner, who would have no biological connection to the child, would have no contract establishing a claim to parentage. Suppose further that no adoption is formalized, and that the couple separates after years in which both parties diligently raise and lovingly support the resulting child. Under the Majority's approach, the second partner has no claim to parent status and no standing to pursue any custody rights. Such a result is by no means dictated by the terms or spirit of our custody standing statute, which speaks in this regard only of "[a] parent of the child", thus begging the question now at hand. *See* 23 Pa C.S. §5324 (1). As well, such a result supplants the best interests analysis, eliminates the focus on the child's needs, and fails entirely to comport with contemporary family realities and especially the circumstances of Pennsylvanians who are parenting in same-sex relationships.

But, wait, you say. The second partner in the scenario imagined above almost certainly would enjoy standing in custody under an *in loco parentis* theory. *See* 23 Pa

C.S. § 5324(2). The problem is not so simple. First, if the couple separates shortly after (or before) the child's birth, the second partner -- who fully intended to be a parent (and this with the first partner's knowledge and consent) -- will have no claim to *in loco parentis* standing, there having been insufficient time for assumption of parental status and discharge of parental duties. *See T.B.*, 786 A.2d at 916-17. Second, and more significantly, resort to an *in loco parentis* approach concedes the parentage claim, which is the very issue that is at bar here. The point is that the second partner in these scenarios should be considered a parent for purposes of standing in custody. *In loco parentis* generally is considered a species of standing sought by *third* parties.[5]

In the past, Pennsylvania courts have found that same-sex partners have standing under the *in loco parentis* rubric. This paradigm has evolved with time and with the forward march of humanity. As a matter of law, a same-sex partner who participated in the decision to bring a child into the world, to raise, to educate, to support and to nurture that child, is no longer a third party. He or she is a parent. *See* Douglas NeJaime, *The Nature of Parenthood*, 126 YALE L.J. 2260, 2317-23 (June 2017) (discussing the practical and expressive harms attending non-recognition of parentage); Jillian Casey, Courtney Lee, & Sartaz Singh, *Assisted Reproductive Technologies*, 17 GEO. J. GENDER & LAW 83, 117 (2016) (identifying "judicial parentage tests that consider factors beyond intent" as a primary source of disparate treatment of same-sex couples seeking parentage). At this

---

[5] *See T.B.*, 786 A.2d at 916 ("A third party has been permitted to maintain an action for custody . . . where that party stands *in loco parentis* to the child "); *Morgan v. Weiser*, 923 A.2d 1183, 1186 (Pa. Super. 2007) ("As a general rule, third parties, other than grandparents, usually do not have standing to participate as parties in child custody actions. An exception to this general rule exists when the third party stands *in loco parentis* to the child.").

late date, there is no defensible reason that partners in scenarios like the one sketched above should not be recognized as parents under the standing statute. It bears emphasis that nothing in the custody statute promulgated by our General Assembly bars such an intent-based approach. Only the judiciary stands in the way.

Observe that members of an opposite-sex couple availing themselves of ART in a situation identical to the one described above would not be consigned to such limbo. If the female partner contracts for ART with a sperm donor and the male partner is not a party to that contract and does not adopt the child, the male partner nonetheless can find shelter (and, more importantly, standing) in the paternity by estoppel doctrine in the event of a separation.[6] The male partner would need only to show that he held the child out as his own. He would not have to attempt intervention as a third party who seeks to stand in the shoes of a parent. I perceive no need or reason for treating these hypothetical parties differently when both intended fully to be parents and when both acted in accordance with those intentions.

While I would embrace an intent-based test for parentage for persons pursuing parentage through ART, I nonetheless concur with the Majority's determination that C.G. was not a parent under the facts of this case as found by the trial court.[7] As the Majority notes, the trial court found that J.H. was credible when she testified that C.G. never intended to be a parent to Child and that C.G. did not act as a parent. Further, the trial

---

[6]    *See supra* n.2.

[7]    "We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *D.K. v. S.P.K.*, 102 A.3d 467, 478 (Pa. Super. 2014).

court credited testimony that C.G. and J.H. reached no mutual decision to become parents. Given that there was no documentary evidence of C.G.'s intent to parent, and given that the trial court found, consistent with the record, that C.G.'s actions were not those of a parent, I join the Majority's conclusion that C.G. did not have standing as a parent pursuant to 23 Pa.C.S. § 5324.[8]

### In Loco Parentis

Turning to the issue of *in loco parentis* standing, I agree with the Majority that the bond between a child and a third party is not dispositive. Maj. Op. at 30. I further agree that "post-separation conduct [of the third party] should not be determinative of the issue of [*in loco parentis*] standing." *Id.* at 32. Nonetheless, the Majority would (and in fact does) permit the consideration of post-separation conduct as "shed[ding] light on . . . whether the person seeking standing was ever viewed as a parent-like figure." *Id.* I differ with the Majority as to how post-separation conduct should be considered and as to the manner in which such conduct plays a role in this case.

The Majority recognizes that there is "potential for misconduct" inasmuch as a parent can withhold the child from the third party in an attempt to destroy an *in loco parentis* relationship. *Id.* Though it acknowledges this concern, the Majority deems it no bar to consideration of C.G.'s post-separation conduct, and "decline[s] to foreclose a trial court from reviewing all relevant evidence. . . ." *Id.* The elasticity of this standard gives

---

[8] With respect both to this issue and to the *in loco parentis* analysis, as the trial court noted, the testimony of the parties and the witnesses was "in direct conflict." T.C.O. at 5. The record provides testimony that, if found credible, would support C.G.'s claims that she intended to be a parent and that she assumed a parental role and discharged parental duties. Similarly, there is testimony that supports J.H.'s claims to the opposite effect. Because we are bound as a reviewing court by the trial court's credibility findings, we must accept the testimony of J.H. and her witnesses.

me pause. If there is evidence that the third party has assumed parental status and discharged parental duties during the relationship, and if there is evidence that the custodial parent purposefully withheld the child, then post-separation conduct should not be considered for purposes of denying standing to the third party. This Court should not countenance even the suggestion that a parent unilaterally can erase from a child's life a third party who, in all material respects, acted as a parent.

The Majority maintains that the trial court in this case did not premise C.G.'s lack of standing upon her post-separation conduct. *Id.* Instead, the Majority opines, the trial court "simply concluded" that the post-separation conduct was "consistent" with the trial court's conclusion that C.G. did not act as a parent. *Id.* In ruling that C.G. did not act *in loco parentis*, the trial court considered that C.G. removed J.H. and Child from C.G.'s health insurance after separation and reasoned that doing so was consistent with C.G.'s post-separation conduct of ending any financial support and arranging for J.H. and Child to leave the shared residence. Trial Court Opinion at 6-7. The trial court also emphasized the fact that C.G.'s extended family did not maintain a relationship with Child following separation. *Id.* at 8. Finally, the trial court devoted one of the six categories it considered in determining *in loco parentis* standing to post-separation conduct. *Id.* at 9-10. In fact, the trial court began that portion of its analysis with: "Perhaps most telling that [C.G.] did not assume the role of a parent is her conduct post-separation." *Id.* at 9. Given that this case hinged upon credibility findings — in that the parties and their witnesses agreed upon very few facts — it appears that C.G.'s post-separation conduct weighed heavily in the trial court's finding that C.G. lacked standing to pursue custody.

The standard that Pennsylvania courts should follow is to foreswear consideration of any post-separation conduct until after they determine whether the custodial parent withheld the child from the third party. Only if the trial court decides that the parent did not withhold the child should the court consider post-separation conduct. This will prevent post-separation conduct from being deployed as a thumb upon the scale unless and until the trial court determines that it was the third party, rather than the custodial parent, who decided to limit post-separation contact. Unlike the Majority, I do not view the trial court's consideration of post-separation conduct here as merely confirming its decision on standing. Instead, it appears that this consideration figured significantly as a distinct and influential factor in the trial court's analysis.

That said, I recognize and respect the reality that the trial court made a finding that J.H. did not withhold the child from C.G. *Id.* at 10. Accordingly, even under the test that I advance here, the trial court would have been free to consider the post-separation conduct.

\* \* \* \* \* \*

In sum, I think that today's case is a missed opportunity for this Court to address the role of intent in analyzing parental standing in ART cases. I differ as well with the Majority's assessment of the manner in which post-separation conduct can be considered in weighing *in loco parentis* claims. These differences notwithstanding, we are bound on appellate review by the trial court's fact-finding and credibility determinations. Under that familiar standard, regardless of my divergences from the Majority's rationale, C.G. lacked standing to pursue custody here. Accordingly, I concur in the result.

Justice Donohue joins the concurring opinion.